## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PETER LAWRENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) Case No. |
| v. | ) ) **CLASS ACTION COMPLAINT FOR** |
| SEMGROUP CORPORATION, THOMAS R. MCDANIEL, CARLIN G. CONNER, JAMES H. LYTAL, SARAH M. BARPOULIS, KARL F. KURZ, WILLIAM J. MCADAM and RONALD A. BALLSCHMIEDE, | ) **VIOLATIONS OF SECTIONS 14(a) AND** ) **20(a) OF THE SECURITIES** ) **EXCHANGE ACT OF 1934** ) ) **JURY TRIAL DEMANDED** ) ) |
| Defendants. | ) ) |

Plaintiff Peter Lawrence ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of SemGroup Corporation ("SemGroup" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with SemGroup, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between SemGroup and Energy Transfer LP ("Energy Transfer").

2.     On September 15, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand

to receive a combination of $6.80 in cash and 0.7275 units of Energy Transfer common units for each share of SemGroup stock they own (the "Merger Consideration"). Upon completion of the merger, SemGroup shareholders will own approximately 2.2% and Energy Transfer unitholders will own approximately 97.8% of the common units outstanding.

3.      On October 3, 2019, in order to convince SemGroup shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "S-4") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  The materially incomplete and misleading S-4 violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.      In particular, the S-4 contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that SemGroup shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by SemGroup's financial advisor, Jefferies LLC ("Jefferies") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.     It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to SemGroup shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because SemGroup is incorporated in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of SemGroup common stock.

12.     Defendant SemGroup is incorporated in Delaware and maintains its principal executive offices at 6120 S. Yale Avenue, Suite 1500, Tulsa, OK 74136. The Company's common stock trades on the NYSE under the ticker symbol "SEMG."

13.     Individual Defendant Thomas R. McDaniel is SemGroup's Chairman and has been a director of SemGroup since November 2009.

14.     Individual Defendant Carlin G. Conner is SemGroup's President and Chief Executive Officer and has been a director of SemGroup since April 2014.

15.     Individual Defendant James H. Lytal has been a director of SemGroup since November 2011.

16.     Individual Defendant Sarah M. Barpoulis has been a director of SemGroup since November 2009.

17.     Individual Defendant Karl F. Kurz has been a director of SemGroup since November 2009.

18.     Individual Defendant William J. McAdam has been a director of SemGroup since March 2017.

19.     Individual Defendant Ronald A. Ballschmiede has been a director of SemGroup since November 2009.

20.     The Individual Defendants referred to in paragraphs 13-19 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of SemGroup (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of October 2, 2019, there were approximately 81,000,000 shares of SemGroup common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of SemGroup will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

iii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.     The Proposed Transaction**

23.     SemGroup provides gathering, transportation, storage, distribution, marketing and other midstream services primarily to producers, refiners of petroleum products and other market participants located in the Gulf Coast, Midwest, and Rocky Mountain regions of the United States and Canada. The Company owns pipelines, gathering systems, storage facilities, terminals, processing plants and other distribution assets located in North American production and supply areas. SemGroup operates through three primary operating segments: U.S. Liquids, U.S. Gas and Canada.

24.     On September 16, 2019, SemGroup and Energy Transfer issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> DALLAS--(BUSINESS WIRE)--Energy Transfer LP (NYSE: ET) ("ET" or "Energy Transfer") today announced that it has entered into a definitive merger agreement whereby Energy Transfer will acquire SemGroup Corporation (NYSE: SEMG) ("SemGroup") in a unit and cash transaction valued at $17 per share, or a total consideration including the assumption of debt of approximately $5 billion, based on the closing price of ET common units on September 13, 2019.

> The merger consideration consists of $6.80 in cash and 0.7275 of an ET common unit for each outstanding share of Class A Common Stock of SemGroup, or 40% cash and 60% equity. This represents a 65% premium to the closing price of SemGroup shares as of September 13, 2019. The transaction is expected to close in late 2019 or early 2020, subject to the approval by SemGroup's stockholders and other customary regulatory approvals. Upon the closing, SemGroup stockholders are expected to own approximately 2.2% of Energy Transfer's outstanding common units.

> **Complementary Assets**

> Energy Transfer's acquisition of SemGroup will increase Energy Transfer's scale across multiple regions and provide increased connectivity for Energy Transfer's crude oil and NGL transportation businesses.

> Energy Transfer will significantly strengthen its crude oil transportation, terminalling and export capabilities with the addition of the Houston Fuel Oil

Terminal ("HFOTCO"), a world class crude oil terminal on the Houston Ship Channel with 18.2 million barrels of crude oil storage capacity, five deep-water ship docks and seven barge docks. HFOTCO is supported by stable take-or-pay cash flows from diverse, primarily investment grade customers. To enhance this optionality, Energy Transfer is also announcing its plans to construct a new crude oil pipeline, the Ted Collins Pipeline, to connect HFOTCO to Energy Transfer's Nederland Terminal.

This acquisition also expands Energy Transfer's crude oil and NGL infrastructure by adding crude oil gathering assets in the DJ Basin in Colorado and the Anadarko Basin in Oklahoma and Kansas, as well as crude oil and natural gas liquids pipelines connecting the DJ Basin and Anadarko Basin with crude oil terminals in Cushing, Oklahoma. These assets will greatly increase Energy Transfer's crude oil and NGL transportation business in the Rockies and Mid-Continent and will complement Energy Transfer's existing crude oil and NGL transportation business in the Permian Basin. Energy Transfer's crude oil assets on the Gulf Coast will also benefit from the Maurepas Pipeline and its connections to the St. James refining complex. The acquisition will also provide a significant crude oil gathering and transportation presence in the Alberta Basin in western Canada.

**Positive Financial Impact**

The transaction, which is expected to have no material impact on credit metrics, increases Energy Transfer's portion of fee-based cash flows from fixed-fee contracts and is expected to be immediately accretive to distributable cash flow per common unit. Also, beyond the equity issued for the transaction, no common equity issuances are expected.

**Synergies**

The combination of Energy Transfer's significant infrastructure with SemGroup's complementary assets will allow the combined company to pursue additional commercial opportunities and to achieve cost savings while enhancing Energy Transfer's ability to serve customers.

The combined company expects to generate more than $170 million of annual run-rate synergies, consisting of commercial and operational synergies of $80 million, financial savings of $50 million and cost savings of $40 million.

**Ted Collins Pipeline**

Also today, Energy Transfer announced plans to construct an approximately 75-mile crude oil pipeline between the Houston Ship Channel and Nederland, Texas to provide a strategic connection between two of the largest crude oil terminals in the U.S., Energy Transfer's Nederland terminal and the HFOTCO terminals.

The Ted Collins Pipeline, in conjunction with the combined companies' oil transportation assets, will provide Energy Transfer's customers with best-in-class access to the Houston, Beaumont/Port Arthur, and St. James markets. This will provide immediate access to over one million barrels per day of existing crude oil export capacity, with plans to expand to over two million barrels, at the Nederland and the HFOTCO terminals. The Ted Collins Pipeline is expected to have an initial capacity of more than 500 thousand barrels per day. Energy Transfer anticipates commercial operations to begin in 2021.

Energy Transfer's vast network of pipelines, which handles over four million barrels per day, will also allow customers the flexibility to access its previously announced Very Large Crude Carrier, or VLCC, project planned from its Nederland terminal.

An investor presentation regarding the transaction will be posted to Energy Transfer's website and filed with the Securities and Exchange Commission (the "SEC") on a Current Report on Form 8-K.

**Advisors**

BofA Merrill Lynch acted as exclusive financial advisor to Energy Transfer and Latham & Watkins LLP acted as legal counsel. Jefferies LLC acted as exclusive financial advisor to SemGroup and Kirkland & Ellis LLP acted as legal counsel.

**About Energy Transfer**

Energy Transfer LP (NYSE: ET) owns and operates one of the largest and most diversified portfolios of energy assets in the United States, with a strategic footprint in all of the major domestic production basins. ET is a publicly traded limited partnership with core operations that include complementary natural gas midstream, intrastate and interstate transportation and storage assets; crude oil, NGL and refined product transportation and terminalling assets; NGL fractionation; and various acquisition and marketing assets. ET, through its ownership of Energy Transfer Operating, L.P., also owns Lake Charles LNG Company, as well as the general partner interests, the incentive distribution rights and 28.5 million common units of Sunoco LP (NYSE: SUN), and the general partner interests and 46.1 million common units of USA Compression Partners, LP (NYSE: USAC). For more information, visit the Energy Transfer LP website at www.energytransfer.com.

**About SemGroup**

SemGroup® Corporation (NYSE: SEMG) moves energy across North America through a network of pipelines, processing plants, refinery-connected storage facilities and deep-water marine terminals with import and export capabilities. SemGroup serves as a versatile connection between upstream oil and gas producers

and downstream refiners and end users. Key areas of operation and growth include western Canada, the Mid-Continent and the Gulf Coast. SemGroup is committed to safe, environmentally sound operations. Headquartered in Tulsa, Oklahoma, the company has additional offices in Calgary, Alberta; Denver, Colorado; and Houston, Texas. For more information, visit the SemGroup website at www.semgroup.com.

25.     SemGroup is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

26.     If the false and/or misleading S-4 is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.    The Materially Incomplete and Misleading S-4

27.     On October 3, 2019, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Transaction.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### The Materially Misleading Sales Process

28.      The S-4 states that throughout the sales process SemGroup was concurrently discussing a potential joint venture with Company A. S-4 34. However, the S-4 fails to disclose any specific details relating to the potential joint venture. The only details mentioned are that the "transaction that would involve the contribution by SemGroup of most of its crude oil related assets, including the Houston Fuel Oil Terminal Company assets, in exchange for 50% ownership in a newly formed joint venture and cash" and that "[t]hese terms reflected a lower ownership percentage and less cash than had been previously proposed by Company A." *Id.* at 38. As the S-4 does not disclose any of the details of the proposed joint venture, including the implied valuations, SemGroup shareholders are unable to determine if the Proposed Transaction is actually preferable over the proposed joint venture.

29.      This information is material because if the Company were to choose the proposed joint venture over the Proposed Transaction, SemGroup shareholders would get to keep their SemGroup stock and the voting rights that come with it. This is compared to the Proposed Transaction where, after the completion of the merger, SemGroup shareholders will own approximately 2.2% of the limited partnership and will not be entitled to elect the directors of Energy Transfer's general partner. *Id.* at 23. The fundamental transformation of SemGroup shareholders' investment from an active participant, able to make changes to the Company through the power of their vote, to a passive investor, who has no right to vote in the selection of Energy Transfer's general partner directors thereby having substantially less control over management, demands that SemGroup shareholders know how attractive the proposed joint venture with Company A (where shareholders would keep their voting power) actually was.

30.     Additionally, the S-4 fails to disclose the "de minimis conflicts of both Jefferies and members of the deal team" that the Board determined to be immaterial both individually and in the aggregate. *Id.* at 39.

### *The Materiality of Financial Projections*

31.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the S-4 discloses "in connection with its evaluation of the merger, SemGroup's management prepared certain unaudited internal financial forecasts with respect to SemGroup, which were provided to the SemGroup board of directors in connection with their evaluation of the proposed merger." *Id.* at 52-53.  The projections were also provided to Jefferies. *Id.* at 53.

32.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

33.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

34.   In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

(i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

35.   Here, SemGroup's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board specifically relied on the financial forecasts to determine that "the merger agreement and the transactions contemplated thereby, including the merger, are fair to, and in the best interests of, SemGroup and its stockholders . . . ." S-4 41-42.

36.   As discussed further below, the non-GAAP financial projections used do not provide SemGroup's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

- 13 -

### *The Financial Projections Relied on by the Board*

37.    The S-4 discloses that "in connection with its evaluation of the merger, SemGroup's management prepared certain unaudited internal financial forecasts with respect to SemGroup, which were provided to the SemGroup board of directors in connection with their evaluation of the proposed merger." *Id.* at 52-53.  The projections were also provided to Jefferies.  *Id.* at 53.

38.    The S-4 goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2022 for:  (1) Adjusted EBITDA and (2) Cash Available for Dividends, but fails to provide (i) the line items used to calculate these non-GAAP metrics nor (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures.  *Id.* at 54.

39.    The S-4 defines Adjusted EBITDA as "net income (loss) before interest expense, income tax expense (benefit), depreciation and amortization and adjusted for selected items that SemGroup believes impact the comparability of financial results between reporting periods."  *Id.* Nevertheless, the S-4 fails to reconcile Adjusted EBITDA to its most comparable GAAP measure nor disclose all of the line items used to calculate Adjusted EBITDA, rendering the S-4 materially false and/or misleading.  *Id.*

40.    The S-4 defines Cash Available for Dividends as "Adjusted EBITDA less interest expense, cash taxes, maintenance capital expenditures, preferred distributions and non-controlling interests."  *Id.*  Nevertheless, the S-4 fails to reconcile Cash Available for Dividends to its most comparable GAAP measure nor disclose all of the line items used to calculate Cash Available for Dividends, rendering the S-4 materially false and/or misleading.  *Id.*

41.    Thus, the S-4's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects

and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

42.    The non-GAAP financial projections disclosed on page 54 of the S-4 violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

43.    As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### *The Financial Projections Violate Regulation G*

44.    The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial

---

[1]    Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

measures."[3]

45.     Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure and a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

46.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]   Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as SemGroup included in the S-4 here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices

---

[3]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

[4]     SEC, *Final Rule.*

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com /2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

*which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

47.     The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

---

[6]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.  The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP

48.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the S-4 into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### *The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9*

49.     In addition to the S-4's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.  Nor can shareholders compare the Company's financial prospects with similarly situated companies.

50.     Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading for the reasons discussed above.  There are inherent limitations associated with the use of non-GAAP financial measures. Non-GAAP financial measures are not prepared in accordance with GAAP, are not necessarily reported by a company's competitors, and may not be directly comparable to similarly titled measures used by a company or its competitors or other companies due to potential differences in the exact method of calculation.

51.     Additionally, the S-4 fails to disclose any financial information regarding Energy Transfer. The implied value of the Merger Consideration on September 13, 2019 was $17.00, with

---

financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Oct. 28, 2019).

60% of the Merger Consideration coming in the form of Energy Transfer common units. S-4 36. This information is necessary for shareholders as a significant portion of the Merger Consideration is Energy Transfer common units. SemGroup shareholders are being asked to give up their Company stock in exchange for Energy Transfer common units. In order for a shareholder to determine the attractiveness of the Merger Consideration, they need to be able to assign a value to the Energy Transfer common units. The value shareholders place on the Energy Transfer common units will directly influence how they value the Merger Consideration.

52.     The value of the Energy Transfer common units is material information because shareholders cannot determine if the exchange ratio fairly values the Company without knowing the stand-alone projections of Energy Transfer. SemGroup must have received at least some financial information regarding Energy Transfer in order for the Board to determine the Merger Consideration fairly valued the Company,[10] and the Company must disclose that information to the shareholders in order to enable the shareholders to make their own determinations.

53.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

---

[10] The only mention of Energy Transfer financial information comes from Jefferies noting that it reviewed "certain information furnished to Jefferies by the management of SemGroup and Energy Transfer, including financial forecasts and estimates and analyses provided by the management of SemGroup and Energy Transfer, relating to the business, operations and prospects of each of SemGroup and Energy Transfer, respectively." S-4 44-45. It is unclear what information SemGroup did receive from Energy Transfer, but that information is material to the shareholders. Alternatively, if SemGroup did not receive any financial information regarding Energy Transfer and the Board was not fully informed when making its decision, that needs to be disclosed to the shareholders.

54.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 54, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

**The Materially Misleading Financial Analyses**

55.     The summary of the valuation methodologies utilized by Jefferies, including the utilization of certain of the non-GAAP financial projections described above by Jefferies, in connection with its valuation analyses (*id.* at 44-45), is misleading in violation of Regulation 14a-9.  The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once an S-4 discloses internal projections relied upon by the Board, those projections must be complete and accurate.

56.     With respect to Jefferies's *Discounted Cash Flow Analysis*, the S-4 states that Jefferies valued both SemGroup and Energy Transfer.  *Id.* at 50.  With respect to valuing SemGroup, Jefferies estimated the present value of the cash available for dividends of SemGroup from calendar year 2020 through calendar year 2024 using financial projections provided by SemGroup. *Id.* Jefferies applied discount rates of 10.77% and 9.77% and terminal yield values of 12.50% and 11.50%. *Id.*

57.     With respect to valuing Energy Transfer, Jefferies estimated the present value of Energy Transfer's distributable cash flow from calendar year 2020 through calendar year 2024 using financial projections provided by Energy Transfer. *Id.* Jefferies applied discount rates of 10.15% and 9.15% and terminal yield values of 8.50% and 7.50%. *Id.*

58.     With respect to Jefferies's SemGroup discounted cash flow analysis (the "DCF"), the S-4 does not disclose the cash available for dividends for calendar years 2023 and 2024, the calculated range of terminal values, the inputs and assumptions that went into the selection of the

terminal yields, whether or not Jefferies used the cost of equity or the weighted average cost of capital in its analysis, any of the inputs that went into calculating the Company's discount rates, whether or not any enterprise adjustments were made nor the fully diluted shares outstanding.

59.     With respect to Jefferies's Energy Transfer DCF, the S-4 does not disclose Energy Transfer's distributable cash flow for calendar years 2020 through 2024, the calculated range of terminal values, the inputs and assumptions that went into the selection of the terminal yields, whether or not Jefferies used the cost of equity or the weighted average cost of capital in its analysis, any of the inputs that went into calculating the Energy Transfer's discount rates, whether or not any enterprise adjustments were made nor the fully diluted shares outstanding.

60.     Since information was omitted, shareholders are unable to discern the veracity of Jefferies's discounted cash flow analyses.  Without further disclosure, shareholders are unable to compare Jefferies's calculations with the Company's financial projections.  The absence of any single piece of the above information renders Jefferies's discounted cash flow analyses incomplete and misleading.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

61.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (Aug. 2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ."  *Id*. (footnote omitted).  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and

lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

62.     Therefore, in order for SemGroup shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

63.     In sum, the S-4 independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the S-4 independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Transaction from SemGroup shareholders.

64.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

65.     Further, failure to remedy the deficient S-4 and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)

66. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [S-4] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

68. As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure. 17 C.F.R. § 244.100(a).

69. The failure to reconcile the non-GAAP financial measures included in the S-4 violates Regulation G and constitutes a violation of Section 14(a).

70. As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to

the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

71.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

72.    SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

73.    Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

74.    Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

75.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed

to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4 but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

76.    The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

77.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

78.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

79.    SemGroup is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

80.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived their right to cast an informed vote if such misrepresentations and

omissions are not corrected prior to the vote on the Proposed Transaction.

81.     As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

82.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

83.     The Individual Defendants acted as controlling persons of SemGroup within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of SemGroup, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

84.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

85.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the S-4.

86.    In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

87.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

88.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding

with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction,

unless and until the Company discloses the material information discussed above which has been

omitted from the S-4;

C.    Directing Defendants to account to Plaintiff and the Class for all damages sustained

as a result of their wrongdoing and to award damages arising from proceeding with the Proposed

Transaction;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated:  October 28, 2019

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: _/s/ Michael Van Gorder_
Michael Van Gorder (#6214)
3828 Kennett Pike, Suite 201
Wilmington, DE 19807
Tel.: (302) 482-3182
Email: mvangorder@faruqilaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
          jwilson@faruqilaw.com

*Counsel for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Peter Lawrence ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against SemGroup Corporation ("SemGroup") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in SemGroup's securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 24th day of October, 2019.

_____
Peter Lawrence

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 08/02/18 | 200 |
|  |  |  |
|  |  |  |